[No. B201280. Second Dist., Div. One. Oct. 1, 2008.]

JOHN MONKS et al., Plaintiffs and Appellants, v.
CITY OF RANCHO PALOS VERDES, Defendant and Respondent.

**COUNSEL**

Stuart Miller; Wellman & Warren and Scott W. Wellman for Plaintiffs and Appellants.

Kutak Rock, Edwin J. Richards and Julie R. Beaton for Defendant and Respondent.

**OPINION**

**MALLANO, P. J.**—In 1978, the City of Rancho Palos Verdes enacted an ordinance imposing a moratorium on the construction of new homes in the vicinity where landslides had recently occurred. Plaintiffs own vacant lots covered by the moratorium. Some have been waiting over 30 years to build homes on their properties. Plaintiffs' lots are zoned for single-family dwellings.

Eventually, the city council established an administrative process allowing the owners of undeveloped lots to seek an exclusion from the moratorium. After the city completed the installation of a sewer system, plaintiffs filed a joint application with the city for permission to build on their properties. In 2002, while the application was pending, the city council conducted a public hearing and toughened the criteria for obtaining an exclusion from the moratorium, approving a resolution making it impossible for plaintiffs to build.

Plaintiffs then filed this action, seeking a writ of administrative mandate to invalidate the resolution and alleging a claim for inverse condemnation based on the state takings clause. Under the state Constitution, "[p]rivate property may be taken . . . for public use only when just compensation . . . has first been paid to, or into the court for, the owner." (Cal. Const., art. I, § 19.) Plaintiffs argued they did not have a full and fair opportunity to present evidence before the city council and should be allowed to introduce additional evidence in the trial court on their takings claim. The trial court denied that request and ultimately found in the city's favor on the merits based solely on the administrative record. Plaintiffs appealed. On February 23, 2005, we concluded that plaintiffs were entitled to a trial on the takings claim and reversed (*Monks v. City of Rancho Palos Verdes* (Feb. 23, 2005, B172698) [nonpub. opn. as mod. Mar. 15, 2005] (*Monks I*)).

A trial followed. The case was tried to the court. During the trial, plaintiffs settled their temporary takings claim, leaving the permanent takings claim for adjudication. Both sides relied in part on the prior administrative record and presented additional documentary evidence and the testimony of witnesses. The trial court determined that a permanent taking had not occurred, finding that the city had acted with proper authority in imposing the moratorium and passing the resolution. Judgment was entered accordingly.

■ We conclude that the resolution, by implementing the moratorium and continuing to prevent plaintiffs from building on their properties, "deprive[d] [plaintiffs'] land of all economically beneficial use." (*Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1027 [120 L.Ed.2d 798, 112 S.Ct. 2886, 2899] (*Lucas*).) Consequently, the city had the burden at trial of proving that the construction ban was justified by "background principles of the State's law of property and nuisance." (*Id.* at p. 1029 [112 S.Ct. at p. 2900]; see *id.* at pp. 1031–1032 [112 S.Ct. at pp. 2901–2902].)

The city failed to meet its burden of justifying the moratorium—as applied to plaintiffs' lots—through evidence showing a reasonable probability of personal injury or property damage other than the possibility of damage to plaintiffs' desired homes in the distant future—damage that could be repaired. A permanent ban on home construction cannot be based merely on a fear of either personal injury or significant property damage. Because the city did not carry its burden in light of the evidence and principles of state nuisance and property law, we reverse the judgment and remand for proceedings to determine an appropriate remedy.

# I

# BACKGROUND

The following evidence, facts, and procedural history are taken from our prior opinion (*Monks I, supra*, B172698) and the subsequent proceedings on remand.

In ancient times, about 100,000 to 120,000 years ago, there was a landslide in part of what is now known as the City of Rancho Palos Verdes. This ancient landslide covered two square miles on the south-central flank of the Palos Verdes Peninsula. Until relatively recent times, the landslide remained inactive and presented no problems. The area became populated with homes.

In August 1957, an area in the ancient landslide, east and southeast of plaintiffs' lots, began to move; this area is commonly known as the Portuguese Bend landslide. Between January 1974 and March 1976, another area in the ancient landslide, south and southwest of plaintiffs' lots, began to move; this area is commonly known as the Abalone Cove landslide. Both remain active.

## A. *The Moratorium*

On September 5, 1978, the city council enacted an urgency ordinance prohibiting the development of property in the ancient landslide area. Section 5 of the "landslide moratorium" states: "It has recently come to the attention of the City Council that the land identified in the Landslide Moratorium Map which was previously thought to be stable may in fact be susceptible to or experiencing current landslide movement. In order to protect the public health, safety and welfare[,] it is necessary for the City of Rancho Palos Verdes to conduct extensive geological studies to determine the stability of the land in question and to determine what remedial measures, if any, the City can take to protect residents of the community. Until such geological studies are completed and evaluated[,] it cannot be determined whether grading and new construction in the Landslide Moratorium Area will adversely impact the stability of said area. . . ." (Rancho Palos Verdes Ord. No. 108U, § 5.) The ordinance exempts "[r]epairs or renovations of existing structures or facilities which do not increase the land coverage" and the "[r]econstruction of an existing building . . . [that has] been damaged or destroyed by fire or other casualty." (*Id.*, § 4(a), (b).) In June 1982, the council amended the ordinance to allow a homeowner to "replace" a "damaged portion [of a residence] for a new equivalent portion without changing form or function." (Rancho Palos Verdes Ord. No. 155U, § 1.) Over the

years, the council has enacted several other exemptions for existing homes located in the moratorium area. (See Rancho Palos Verdes Mun. Code, § 15.20.040.)

## B. *The City's Response to the Landslides*

The city retained Robert Stone & Associates to perform a geotechnical investigation of the Abalone Cove landslide. In a February 28, 1979 report, Stone referred to the *northern* part of the moratorium area—where plaintiffs' lots are located—stating: "Only two actions are likely to cause renewed sliding within this area. One is loss of support on the downward slope as a result[] of headward propagation of the active Portuguese Bend and Abalone Cove landslides. . . . The other action which could cause renewed sliding would be build up of ground water above the level previously experienced during the last several thousand years."

The Stone report noted that a *southern* portion of the moratorium area, unlike the northern part, was still active: "Where the landslide crosses Palos Verdes Drive South, it has a total displacement of nearly 2½ feet and is moving at an average rate of about 1 inch per week." The active slide area in the south extended northward to a point about one-fourth of a mile below plaintiffs' lots. The report recommended that four to six "dewatering" wells be placed near the "head" of the active slide to remove groundwater and that a sewer system be installed.

In 1987, the city received $10 million for abatement projects to improve plaintiffs' lots and the surrounding areas. Part of this money would later be used to install a sewer system for plaintiffs' properties.

In December 1991, the city council established an administrative process allowing lot owners to seek an exclusion from the moratorium. To be exempt, the owner had to show that the proposed residence would "not aggravate any existing geologic conditions in the area." (Rancho Palos Verdes Mun. Code, § 15.20.100.C.3.)

On May 26, 1993, Perry Ehlig, the city geologist, sent a memorandum to the city's director of public works, proposing that the moratorium area be divided into eight zones for purposes of discussing remediation efforts and residential development. The city agreed. Plaintiffs' lots are located in "Zone 2." As Ehlig indicated, each zone has its own unique characteristics. "Zone 1" consists of about 550 acres of "[u]nsubdivided land unaffected by large historic landslides and [is] located uphill or to the west of sub-divided areas." It is the top, or northernmost, zone and curves downward to the southwest, extending to the ocean. By curving in a southwestern

direction, Zone 1 becomes the western border for the entire moratorium area. Zone 2, which covers approximately 130 acres, consists of "[s]ubdivided land unaffected by large historic landslides"; it is located below Zone 1. "Zone 6" occupies the eastern portion of the moratorium area, covers about 210 acres, and includes parts of the Portuguese Bend landslide; it touches Zone 2's eastern border where Zone 2 is approximately 425 feet from north to south. "Zone 3," the smallest zone, with about 15 acres, is "[u]nsubdivided land unaffected by large historic landslides and [is] located seaward of Sweetbay Road"; at its northernmost point, Zone 3 abuts about one-fourth of the southeastern line of Zone 2. "Zone 5," approximately 90 acres in size, is "[l]and affected by the Abalone Cove landslide and adjacent land where minor movement has occurred due to loss of lateral support"; the northern portion of Zone 5 runs along the south-central line of Zone 2. In short, Zone 2 is bounded by Zone 1 to the north, Zone 6 to the east, Zone 3 to the southeast, Zone 5 due south, and Zone 1 to the southwest and the west. (Zones 4 and 8 are to the east of Zone 6 and do not touch Zone 2; zone 7 runs along the shoreline, below Zone 6.)

Plaintiffs' lots are zoned exclusively for single-family homes. Most of the lots are around an acre in size, and many have ocean views. There are a total of 111 lots in Zone 2: 64 lots have homes, and 47 are undeveloped. Plaintiffs own 16 of the undeveloped lots.[1] Plaintiffs' lots are located in three northern clusters: nine lots to the west; five central lots; and two lots to the far east. The 14 western and central lots are north of Narcissa Drive and west of Vanderlip Road. The other two lots are on the eastern end of Sweetbay Road just before Sweetbay takes a sharp turn to the south. All of plaintiffs' lots are across the street from, or adjacent to, a lot with a home, giving the neighborhood a checkerboard appearance.

In his May 26, 1993 memorandum, Ehlig stated that certain lots in Zone 2 "could be developed without adversely affecting the stability of the large ancient landslide. In fact, if development were combined with installation of additional wells, stability would be improved. Most lots can be developed with minimal grading and without a net import or export of earth. Such grading would have no impact on the stability of the deep-seated slide. [¶] Ground water is the only variable within Zone 2 which affects its stability. Zone 2 currently contains one monitoring well and four producing[, or dewatering,] wells. Eight to ten more monitoring wells are needed to provide a detailed picture of ground water conditions within Zone 2. Four to six more producing wells are needed to better control ground water conditions. If the

---

[1] Plaintiffs are 14 individuals and families who each own one lot, with the exception of one individual who owns two lots. Another lot is jointly owned by a corporate plaintiff and a nonparty trust.

costs of the needed wells were funded from fees paid for permission to develop vacant lots, development would improve the stability of the large ancient landslide."

In 1995 and again in later years, the city amended the municipal code to allow owners of undeveloped lots in Zone 2 to build a "temporary minor nonresidential structure[]," provided it did not exceed 320 square feet, did not increase water usage, served a nonhabitable purpose, and was approved by the city's director of planning, building, and code enforcement. (See Rancho Palos Verdes Mun. Code, § 15.20.040.I.)

Discussions between city officials and the lot owners in Zone 2 sometimes focused on the "factor of safety," a geotechnical term used to explain the stability of a parcel of land. The factor of safety is expressed as a number reflecting the relationship between the physical factors that cause instability and those that aide stability. A safety factor of 1.0 indicates that the instability forces are equal to the stability forces, and the property is therefore considered "barely stable or almost unstable." A safety factor of 1.5 means that the forces of stability are at least 50 percent greater than the forces that cause instability. An area with a factor of safety greater than 1.0 is stable by definition. Nevertheless, because a safety factor cannot be calculated with precision, a factor of at least 1.5 provides an important margin of error and is accepted as the standard factor of safety by geotechnical professionals for residential construction. A smaller margin of error—a lower factor of safety—may be appropriate for construction if more is known about the geology of a particular area, for example, that the groundwater is under control. For purposes of the present case, a "local," or "localized," factor of safety refers to the stability of a single lot in Zone 2; a "gross" safety factor refers to Zone 2 in its entirety.

In an "Initial Study," subtitled "Third Screencheck," dated September 20, 1996, Impact Sciences, Inc., provided the city with advice concerning "Relaxation of Development Restrictions in '[Zone 2]' of Abalone Cove Landslide Moratorium Area." The study was prepared in accordance with the provisions of the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) and related guidelines. It noted that "[m]ost of [Zone 2] is an area where the ancient landslide has a flat base and the earth has nearly a neutral effect on forces tending to move the inactive landslide." The study also stated: "There are no unique geologic or physical features within [Zone 2]. All geologic and physical features within [Zone 2] are found elsewhere on the southerly slopes of the Palos Verdes Peninsula. [A]ny development would be constructed primarily within or adjacent to existing developed areas. Thus, future development in Zone 2 would not adversely impact any unique geologic or physical features and no further study of this

topic is warranted." Under the heading "Mandatory Findings of Significance," the study indicated that residential development in Zone 2 would have "less than [a] significant impact" on various aspects of the environment, including adverse environmental effects on human beings, directly or indirectly.

On January 17, 1997, Impact Sciences, Inc., issued an "Initial Study," subtitled "4th Screencheck Draft," on the same subject. This study contained the same Mandatory Findings of Significance as the earlier report.

At an "Adjourned Meeting" of the city council on January 25, 1997, Les Evans, the public works director, addressed efforts to allow the construction of new homes in Zone 2. He summarized the history of the ancient landslide area, the Abalone Cove slide that began in 1974, and the city's 1978 moratorium. He noted that, in February 1995, the council approved the preparation of "environmental documents" for the "Zone II Landslide Exception Project" by Impact Sciences, Inc. Then, in March 1995, five "peer review" consultants—four geologists and one geotechnical engineer—were selected as a "peer review group" to make recommendations regarding the construction of new homes in Zone 2.

According to Evans, the peer review group concluded that the gross safety factor in Zone 2 had to be greater than 1.0 to allow construction—probably around 1.2 as a rough estimate. The group's overall consensus was that the gross stability of Zone 2 was unknown and could not be calculated except at great expense. Estimates to conduct a study ranged from several hundred thousand dollars to two to three times that amount. In general, the group "agreed that the utilization of a 1.5 factor of safety as a benchmark for building was an arbitrary number based on years of experience by the overall geotechnical community." The owner of an individual lot "could not practically calculate" a factor of safety for the "entire landslide area" but could do so for his or her own lot. The peer group believed that "[t]he potential for movement of the underlying landslide should not be the small property owner's responsibility." The local—lot specific—factor of safety would deal only with soil conditions and landslides on individual lots and the impact of local grading to insure safety against local failure. The consultants stated they "would be more comfortable with a factor of safety less than 1.5 which was based on extensive testing and which they had confidence in, than they would in a factor of safety of 1.5 that was based on minimal testing and therefore less reliable." The group recommended that a property owner sign an indemnification and "hold harmless" agreement with the city before being allowed to build.

At the end of the January 25, 1997 meeting, the council requested that city staff prepare a report listing the "policies in place, the mitigation measures

already taken, what projects have been completed, a timeline for proposed projects, and the amount and source of funding for these projects."

On June 2, 1999, at the Ocean Trails Golf Course in Rancho Palos Verdes, the 18th hole—situated on the beachfront—suddenly separated from the rest of the course and moved about 100 feet toward the ocean. The golf course is about one linear mile to the southeast of plaintiffs' lots.

## C. The Study by Cotton, Shires & Associates

On March 6, 2001, the city council commissioned a study by Cotton, Shires & Associates (CSA)—as stated in the minutes—to determine "if it is safe to build on lots with a localized safety factor of 1.5 assuming that the gross area factor is not that high and to determine any cumulative effect by development of the . . . vacant lots." CSA was instructed to review existing data.

On September 12, 2001, CSA submitted an initial report. The city council discussed the report at a regular meeting on September 18, 2001. William Cotton, of CSA, attended the meeting, discussed the report, and answered questions from the council. Members of the public were permitted to speak. Plaintiff John Monks was there and did so. The city provided CSA with additional information and asked that a revised report be prepared.

On October 11, 2001, the city received an unsolicited report written by David Cummings, a geologist who had worked on the "Horan litigation"—a lawsuit by several homeowners brought against the city in the aftermath of the Abalone Cove landslide. In his report, dated April 3, 1997, Cummings commented that "Zone 2 may be in a state of failure although movement may be slow." He concluded that additional geologic and geotechnical studies were necessary to determine the stability of Zone 2, the use of a local factor of safety of 1.5 was not a reasonable approach, and the stability of the area surrounding Zone 2 should be considered.

On January 14, 2002, CSA sent a final report to the city manager. The report, written by two geologists and a geotechnical engineer, stated: "It is our opinion that there is insufficient subsurface information to properly characterize either the depth to the base of landsliding, strength properties of the landslide materials, or the groundwater levels. These parameters are essential elements in the conduct of a thorough slope stability analysis. The standard-of-care for the geotechnical engineering profession is to achieve a factor of safety of 1.50. . . . Without these data, no accurate slope stability analysis can be undertaken, no reliable factor of safety can be calculated, and no dependable landslide mitigation scheme can be designed. We conclude

that one cannot quantitatively determine the factor of safety and, therefore, we cannot judge that level of risk of development in the prehistoric landslide area (i.e., Zone 1 and Zone 2)."

The report explained: "The City should . . . understand that in our judgment, the development of the remaining parcels will not be of sufficient impact, in and of itself, to **cause** instability of the Zone 2 landslide mass, providing certain conditions are met and careful geotechnical review is conducted by the City. [¶] . . . [¶]

". . . Regarding the question of allowing the remaining lots in Zone 2 to be developed, we believe that the lots can be developed without **causing** the large, regional landslide to be destabilized. This conclusion assumes that individual parcels will be developed using [certain] grading methods and construction techniques, that strict geotechnical review by the City Geotechnical Reviewer and the project geotechnical consultant will be required, and that certain conditions . . . are adhered to. In our judgment, the additional development in Zone 2 will be exposed to the same level of unknown potential risk to which existing residents are exposed. If the City decides to allow development of the remaining approved parcels in Zone 2, it should do so with the understanding that the risk of . . . reactivation of all or part of the regional landslide mass is **unknown**. It is clear that the factor of safety of the landslide mass that underlies Zone 2 is above 1.00, but likely less than the industry's standard safety threshold of 1.50." (Original boldface.)

Eventually, the city installed utilities for the vacant lots in Zone 2, namely, gas, electric, and water. The sewer system was completed in late 2001. On January 16, 2002, plaintiffs jointly filed an application with the city's department of planning, building, and code enforcement, requesting an exclusion from the moratorium.

D. *Approval of the City Resolution*

On May 20, 2002, while plaintiffs' application was pending, the city council held an "adjourned" regular meeting to discuss the CSA report. The agenda for the meeting was made public earlier that day on the city's Web site and at the meeting location. The agenda stated that the council would consider accepting the conclusions of the CSA report, as follows: (1) there is insufficient subsurface information to calculate a reliable factor of safety; (2) the level of risk of development on the vacant lots cannot be determined; and (3) the factor of safety of the landslide mass that underlies Zone 2 is above 1.0, but likely less than 1.5.

According to the agenda, the city council would also decide whether to approve a proposed standard for granting development permits in Zone 2,

namely, to "[c]ontinue to deny requests for development permits for new homes in . . . Zone 2 . . . based on the current lack of evidence that the subject land has a factor of safety of 1.5 or greater, unless an applicant submits a complete Landslide Moratorium application that is supported by adequate geological data." By memorandum circulated to council members the day of the meeting, the city manager recommended that the council accept the conclusions of the CSA report and the proposed standard for granting development permits for new homes.

The council meeting was called to order at 7:05 p.m. Cotton discussed the CSA report and answered questions from council members. Mayor Pro Tempore Douglas Stern proposed that the council approve several additional conclusions based on his interpretation of the report. The council invited public comments. Monks was present and spoke, saying that he owned three vacant lots and had retained a geologist who determined that his property had a safety factor of 1.5 or higher. Monks supported the use of a localized safety factor of 1.5. After comments from the public, the council approved (1) the conclusions in the CSA report, (2) Stern's additional conclusions with certain modifications, and (3) the proposed standard for granting development permits to build new homes in Zone 2.

On June 12, 2002, the city council approved resolution No. 2002-43, which was intended to set forth the city council's decisions from the May 20, 2002 meeting. The resolution recited: (1) with respect to Zone 2, there was insufficient data to determine a reliable factor of safety; (2) it was therefore not possible to judge the level of risk of development in that zone; (3) the factor of safety in Zone 2 was "above 1.00, but probably less than the industry's standard safety threshold of 1.50 for residential development, which also is the standard . . . used by the [city]," as mandated by the city's building code (see Rancho Palos Verdes Mun. Code, §§ 15.18.010, 15.18.100, adding § 110A.2); (4) the "Factor of Safety of 1.5 for slope stability . . . is applied throughout the City [and] should be applied within the boundaries of the Landslide Moratorium Area"; (5) "[g]eologically, the level of risk of allowing development of undeveloped residential lots in Zone 2 is presently unknown"; (6) "a number of mitigation measures have been employed, [but] to date no quantitative geotechnical analysis to determine the effectiveness of these measures has been undertaken"; (7) the CSA report erred in concluding that the vacant lots could be developed without further destabilizing the large regional landslide; and (8) the city rejected that conclusion because, according to the city, it was not based on a factor of safety of at least 1.5.

The resolution concluded: "Based on the foregoing, the City Council is directing City Staff to continue to deny requests for development permits for new homes in the Zone 2 area . . . because of the current lack of evidence

that the Zone 2 area has a factor of safety of 1.5 or greater, until an applicant submits a complete Landslide Moratorium Exclusion application that is supported by adequate geological data demonstrating a factor of safety of 1.5 or greater of the Zone 2 area to the satisfaction of the City Geologist; the City Council approves the . . . application, and all other permits to develop [the property] are issued by the City."

Before resolution No. 2002-43 was approved, the city did not require lot owners in Zone 2 to establish a *gross* safety factor of 1.5 or higher as a condition of construction.

At the time of the resolution's adoption, city officials were well aware that, as stated in an October 16, 2000 letter from the city manager to Monks, "the geologists all agree that the gross stability of the land area referred to as Zone 2 has a factor of safety of less than 1.5." The CSA report concluded that Zone 2 likely had a safety factor less than 1.5. And as early as March 1996, the city geologist knew that "the factor of safety [for Zone 2] is probably not 1.5 but is greater than 1.25."

City officials also understood that a geological study to determine the safety factor of Zone 2 would cost somewhere between $500,000 and $1 million. In his memorandum to the city council recommending acceptance of the CSA report, the city manager put the figure at around $500,000. At the council meeting, Cotton said it would cost "hundreds of thousands of dollars, if not approaching a million dollars probably." Years earlier, Evans had estimated in a January 25, 1997 memorandum to the council that a study would cost from several hundred thousand dollars to double or triple that amount.

Because the resolution had the effect of keeping the moratorium in place, we use "resolution" and "moratorium" interchangeably in this opinion.

E. *The Civil Suit*

In light of resolution No. 2002-43, plaintiffs decided not to pursue their pending application for an exclusion from the moratorium. Instead, on July 10, 2002, they filed this action, consisting of a petition for a writ of administrative mandate and a complaint for inverse condemnation. An amended pleading was subsequently filed.

On May 6, 2003, plaintiffs filed a memorandum of points and authorities, arguing that the city council had abused its discretion in approving resolution No. 2002-43 and that the resolution constituted a "taking" within the meaning of article I, section 19 of the California Constitution. Plaintiffs stated that

they "have had no opportunity to testify, to offer opinions of their own experts, or to question City officials and consultants," and if " 'the administrative record is not an adequate basis on which to determine if the challenged action constitutes a taking' . . . , plaintiffs reserve their right to take discovery and introduce additional evidence, particularly in the form of their own testimony, the testimony of experts, and the examination of City officials."

The city filed an opposition to the petition for a writ of administrative mandate and the inverse condemnation claim. Plaintiffs filed a reply memorandum.

On October 31, 2002, the parties appeared before the trial court, Judge Lois Anderson Smaltz presiding. The transcript of the proceeding includes this colloquy:

"The Court: I set the matter for oral argument because there were some references in your briefs, in your points and authorities, with respect to questioning whether the court would set a hearing. I did conclude, based upon the authorities you submitted, that an evidentiary hearing is not appropriate. So [the court] will rely on the evidence that was previously submitted in the administrative hearing and that was referred to throughout your authorities here. [¶] . . . [¶]

"[Counsel for plaintiffs]: [T]he . . . question the court must ask is whether the plaintiffs had an opportunity before the city for a full and fair hearing, meaning did they have an opportunity to present all of their arguments and evidence to the city before it made its determination. [¶] . . . [¶] . . . [I]f there has not been a full and fair hearing, then the court holds an evidentiary hearing. [¶] . . . [¶]

"Now, in this case there has not been such a full and fair hearing. . . . [¶] . . . [¶] [T]he plaintiffs had no opportunity at all to speak up against these proposals; to present evidence; to present the declarations of experts; to present a technical analysis of the [CSA] report, which it turned out was the sole basis, or the primary basis, for these resolutions."

After both sides presented argument, the trial court stated on the record that the writ petition was denied and that resolution No. 2002-43 did not constitute a taking. The trial court later filed a statement of decision, stating in part, "The court perceives no need for further evidentiary hearings or trials." Judgment was entered in favor of the city. Plaintiffs appealed (*Monks I, supra*, B172698).

F. *The Prior Appeal*

In this court, plaintiffs asserted that the trial court should have conducted a trial on their takings claim and allowed them to submit evidence outside the administrative record. For its part, the city argued that the takings claim was not ripe and that the suit was barred by the statute of limitations.

In *Monks I*, we agreed with plaintiffs and rejected the city's arguments. First, we concluded that the administrative record—the documents related to the May 20, 2002 hearing before the city council—was not adequate to resolve the takings claim and that plaintiffs were entitled to a trial. (See *Monks I, supra*, B172698, discussing *Healing v. California Coastal Com.* (1994) 22 Cal.App.4th 1158, 1169–1170, 1173–1179 [27 Cal.Rptr.2d 758] and *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 13–16 [32 Cal.Rptr.2d 244, 876 P.2d 1043] (*Hensler*).)

Second, we found that the takings claim was ripe, explaining: "In general, '[t]he impact of a law or regulation on the owner's right to use or develop the property cannot be assessed until an administrative agency applies the ordinance or regulation to the property and a final administrative decision has been reached with regard to the availability of a variance or other means by which to exempt the property from the challenged restriction. A final administrative decision includes exhaustion of any available review mechanism. Utilization of available avenues of administrative relief is necessary because the court "cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." ' (*Hensler, supra*, 8 Cal.4th at p. 12.) ' "[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." ' (*Id.* at p. 10.)

"But '[w]hile a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened. . . . [¶] . . . [¶] In assessing the significance of [a landowner's] failure to submit applications to develop the [property] it is important to bear in mind the purpose that the final decision requirement serves. Our ripeness jurisprudence imposes obligations on landowners because "[a] court cannot determine whether a regulation goes 'too far' unless it knows how far the regulation goes." . . . Ripeness doctrine does not require a landowner to submit applications for their own sake. [A landowner] is required to explore development opportunities on his . . . parcel only if there is uncertainty as to the land's permitted use.' (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 620–622 [150 L.Ed.2d 592, 121 S.Ct. 2448].)

" '[C]ourts have recognized the ripeness requirement cannot be used to require that property owners resort to "piecemeal litigation or otherwise unfair procedures." . . . The Ninth Circuit "recognizes a limited futility exception to the requirement that a landowner obtain a final decision regarding the application of land use regulations to the affected property. . . . Under this exception, . . . the application for a variance from prohibitive regulations may be excused if those actions would be idle or futile. . . . The landowner bears the burden of establishing, by more than mere allegations, the futility of pursuing any of the steps needed to obtain a final decision. . . . Moreover, before claiming the exception, the landowner must submit at least one development proposal and one application for a variance if *meaningful* application and submission can be made. . . ." . . . [¶] . . . [¶]

" 'The futility exception as articulated in California cases has largely followed the pattern described by the Ninth Circuit . . . . That is, our cases have recognized that the exception is narrow and that it requires some development proposal by the landowner and that only when, by way of its response to the proposal, a governmental agency has as a practical matter defined what development will be allowed may a court then determine whether there has been a taking. "The futility exception is extremely narrow: '[T]he mere possibility, or even the probability, that the responsible agency may deny the permit should not be enough to trigger the excuse. . . . To come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so).' . . ." ' (*Calprop Corp. v. City of San Diego* (2000) 77 Cal.App.4th 582, 593–594 [91 Cal.Rptr.2d 792], italics added, citations omitted.)

"In addition, courts may consider the expense of the administrative process as one factor in determining whether exhaustion is appropriate. (See *Action Apartment Assn. v. Santa Monica Rent Control Bd.* (2001) 94 Cal.App.4th 587, 613–614 [114 Cal.Rptr.2d 412].) Exhaustion may be required ' "when the administrative proceeding involves *no unusual* expense." ' (*Public Employment Relations Bd. v. Superior Court* (1993) 13 Cal.App.4th 1816, 1829 [17 Cal.Rptr.2d 323], italics added; accord, *Kane v. Redevelopment Agency* (1986) 179 Cal.App.3d 899, 907, fn. 4 [224 Cal.Rptr. 922].)

"In this case, plaintiffs submitted an application to be excluded from the moratorium. While the application was pending, the city approved Resolution No. 2002-43, requiring lot owners to submit geological data—at a cost $500,000 to $1 million—showing that Zone 2 has a safety factor of 1.5 or higher—notwithstanding that 'the geologists all agree that the gross stability of the land area referred to as Zone 2 has a factor of safety of less than 1.5.'

"By way of this suit, plaintiffs challenge the requirement that they show a safety factor of 1.5 for the entire zone. They argue that a lower safety factor should be used and that the safety factor of an individual lot, not the zone, should be determinative.

"The outcome of the administrative process is certain: [P]laintiffs' applications for an exclusion from the moratorium would be denied because they cannot show that the safety factor of the zone is 1.5 or higher. Given this, plaintiffs cannot build homes on their lots. Thus, it is clear 'how far the regulation goes.' (*Hensler, supra*, 8 Cal.4th at p. 12.) And the inordinate expense of the administrative process counsels against exhaustion.

"Finally, the city takes the position that Resolution No. 2002-43 was based on the CSA report. The trial court concluded in its statement of decision, 'Any assumption on [plaintiffs'] part that the City Council would disregard the conclusions of the CSA report and apply a standard inconsistent with CSA's conclusions was unreasonable.' [The resolution recited, based on the CSA report, that Zone 2's factor of safety was "probably less than" 1.5.] In other words, exhaustion was futile." (*Monks I, supra*, B172698.)

Third, we rejected the city's contention that the takings claim was barred by the statute of limitations, noting: "The city contends this action is barred by the statute of limitations, specifically, section 65009, subdivision (c)(1)(B) of the Government Code, which states: '[N]o action or proceeding shall be maintained in any of the following cases by any person unless the action or proceeding is commenced and service is made on the legislative body within 90 days after the legislative body's decision: [¶] . . . [¶] . . . To attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a zoning ordinance.'

"The city maintains that plaintiffs had to file suit within 90 days after the moratorium was initially enacted on September 5, 1978. We disagree. For one thing, on its face, the moratorium did not forever preclude the construction of new homes. It stated in part: '[I]t is necessary for the City of Rancho Palos Verdes to conduct extensive geological studies to determine the stability of the land in question and to determine what remedial measures, if any, the City can take to protect residents of the community.' Further, after the enactment of the moratorium, the city took several steps suggesting that new homes might one day be allowed. For example, it installed utilities for the vacant lots—gas, electric, water, and sewer.

"And . . . plaintiffs do not challenge the 1978 moratorium. Rather, they attack Resolution No. 2002-43, which requires them to show that the safety factor of Zone 2 is 1.5 or higher. Even the city acknowledges in its brief that

'[t]he requirements for exclusion applications remained substantially unchanged from 1991'—when the city established an administrative exclusion process—'to 2002'—when Resolution No. 2002-43 was enacted. That resolution was approved on June 20, 2002. This action was filed on July 10, 2002. It is therefore timely." (*Monks I, supra,* B172698.) Thus, in *Monks I,* we reversed the judgment and remanded the case for a trial on plaintiffs' takings claim.

## G. *The Trial*

The case was tried to the court, Judge Cary H. Nishimoto presiding, on nonconsecutive days from November 20, 2006, to March 28, 2007. The trial court had the benefit of not only the administrative record but the testimony of witnesses, primarily experts.

Plaintiffs presented their evidence first. John Foster, a professor of engineering geology at California State University at Fullerton who holds a professional geology license and a certification as an engineering geologist, has visited the Abalone Cove and Portuguese Bend landslides a dozen times for professional reasons. As a preliminary matter, he described the types of geological landslides: (1) a fall, where a block of material, such as a rock, breaks off and tumbles; (2) a flow, where mud or fragmented material moves quickly over an area, destroying houses and trees in its path; (3) a block glide, in which large blocks of earth or rock move along a single plane; and (4) a slump, which tends to rotate in place. In the Rancho Palos Verdes moratorium area, the previous, current, and potential slides are block glides and move at a much slower rate than flows. Block glides generally present no risk of harm to people.

As Foster stated, when the Abalone Cove landslide started in the 1970's, it "moved on the order of 10 or 15 feet, and overall it's moved about 30 feet." By around 1985, there was no further "perceptible" movement—according to aerial photographs—although "surveys" show present movement in the millimeters during a heavy rainfall. The Abalone Cove landslide was brought under "control" through the use of dewatering wells. Water has a destabilizing effect on land by making it "buoyant" and more susceptible to movement. For example, the use of a sewer system, as opposed to septic tanks, reduces the water that goes into the ground and lowers the risk of a slide.

Foster testified that, to a reasonable scientific certainty, it was "safe" to "build the plaintiffs' 16 homes in Zone 2." When asked to explain his opinion, Foster emphasized the effect of the water wells, the natural constraints ("basalt buttresses") that restricted the further movement of the Abalone Cove landslide area, and the "relatively flat surface" of Zone 2

compared to the terrain to the south, which is steeper. Based in part on his review of prior geological reports—including those by Keith Ehlert, Neblett & Associates, and Leighton & Associates—Foster concluded that geotechnical "cross-sections drawn through the plaintiffs' properties" showed a factor of safety of 1.5 or greater. Foster also said that if he were searching for evidence of movement in the vicinity of plaintiffs' properties, he would look for long linear cracks in the ground and problems in the existing homes, such as doors that stick or windows that will not open or shut properly. He was not aware of any such conditions around plaintiffs' properties.

Foster was also asked, "What effect or impact, if any, would the construction of the plaintiffs' homes have on [Zone 2] from a geological standpoint?" He answered that the "construction of a home or even the number of homes we're talking about here would be very minor in terms of the addition of any weight. Homes are mostly air; so it would be minimal. There would be an addition of weight to the area, but it would be very minimal." Foster also stated that development of the lots would "intercept" rainfall that would otherwise seep into the ground. Landscaping would also "intercept" rainfall because it "doesn't allow rain[] to . . . erode the ground." Foster opined that, "for the stability of the area," the "construction of the plaintiffs' homes . . . [¶] . . . would be a net positive."

As for the conclusion of the CSA report that "the lots can be developed in Zone 2 without destabilizing the region," Foster commented, "[r]isk is a measure of the likelihood and the magnitude of something that's going to happen—in this case, in a natural phenomenon that can be destructive." Foster was then asked about the "risk to life or limb" from building in Zone 2 "where plaintiffs' lots are located." He did not see "any risk" to "life and limb." With respect to the risk of structural damage to property, Foster replied that "[y]ou have to look at each lot. . . . From the standpoint of the old landslide surface reactivating the mov[ement] to tear these homes apart, no, I don't see the risk there. [¶] . . . [¶] Individual lots, if they are on a slope of some kind, need to have their own measure of risk made to them," which "can be done with a *local* factor of safety." (Italics added.) In Foster's words, "Typically you would want to establish [a] factor of safety for *your* property." (Italics added.) It would not be "relevant" for an individual lot owner to show the safety factor for other parts of Zone 2.

Plaintiffs introduced several types of evidence indicating that, after the enactment of the 1978 moratorium, the city allowed construction in Zone 2 without proof of a local or gross safety factor of at least 1.5. It did so by approving "exception permits" in response to applications from owners of existing homes. In 1988, a house consisting of 3,300 square feet was moved from the active area of the Portuguese Bend landslide to a vacant lot in Zone 2,

82 Narcissa Drive. A foundation and driveway were constructed. No safety factor was shown. Later, an underground storage area, deck, hot tub, and balcony were approved for the same house, again without establishing a safety factor. In 1993, the city approved the demolition of the house at 57 Narcissa Drive and the construction of a new dwelling, 300 square feet larger than the original. The owners established a gross safety factor of 1.23. Between 1992 and 1994, the owners of the house at 29 Sweetbay Road received city approvals for the addition of 2,480 square feet, including a detached garage and a second story loft; no safety factor was shown. In 1999, the city approved 1,410 square feet of additional construction for 33 Sweetbay Road, primarily related to a patio. And in 2001, the owners of 25 Sweetbay Road obtained approval to (1) convert a 441-square-foot garage into habitable space and (2) build a new 690-square-foot detached three-car garage with a 319-square-foot trellis. No factor of safety was established.

The city also approved exception permits for existing homes in Zone 5. In 2005, the city allowed the owner of 31 Narcissa Drive to remodel and repair a distressed home, including the construction of a new foundation, notwithstanding the city's knowledge that " '[t]he slope stability in Zone 5 should be considered to be unstable, for which the factor of safety is less than 1.0. . . . Structural distresses resulting from . . . future slide movements may occur in the residence. Structural distresses may result in cracks, separations, tilting up on walls, ceilings, and/or floors of the residence. . . . Current and future owners should be aware of that possibility and be responsible accordingly.' " In 2004, extra footage totaling around 2,155 square feet was approved for 5 Clovetree Place—including a one-story addition, a detached barn, and a detached garage—even though the city was informed again that Zone 5 "should be considered unstable with a factor of safety of less than 1.0."

Returning to plaintiffs' witnesses, Howard Chang is a hydrologist who taught at San Diego State University for 40 years and has a doctorate in civil engineering, with a specialty in hydraulics erosion and sedimentation. Chang has actively consulted for the same length of time and is currently a consultant for the Three Gorges Dam in China, one of the largest construction projects ever undertaken. Chang has traveled "extensively" through Zone 2, on foot and by vehicle. The terrain is "primarily level," he said. "[T]he slope is usually very gentle, mild, and gently rolling."

Consistent with Foster's testimony, Chang said, "Groundwater can be a factor for ground instability. By removing the groundwater, we can definitely improve the stability of the ground." After discussing the operation of the dewatering wells throughout the moratorium area, Chang opined, based upon a reasonable scientific certainty, that "there should be no instability problem" "regarding the proposed building of the plaintiffs' sixteen homes in Zone 2."

Asked about whether "the irrigation produced by the sixteen homes [would] contribute to [a] groundwater [increase]," Chang replied, "That should not be a problem at all" because "the water table is very well controlled by the [dewatering] wells." The wells "are so powerful, they are not even working to their full capacity." "[T]he irrigation water would simply be removed in its entirety by the dewatering wells." Chang noted that "irrigation would only occur on landscaped areas. It does not occur on roof tops. It does not occur on pavement, nor does it occur on streets." And to the extent that plaintiffs overwatered their lawns, had pool leaks, or engaged in behavior that increased the water on the subsurface, "the dewatering wells . . . can pump out anything as a result." In response to the question, "[F]rom a hydrologist's view, what is your opinion of [the] city policy that does not allow development of homes in Zone 2," Chang stated, "I see no reason for the city's policy." When asked about the city's policy of permitting the expansion of existing homes but prohibiting the construction of new ones, Chang said, "I don't think the city's policy is valid."

Iraj Poormand, a geotechnical engineer, holds a master's degree in geotechnical engineering and has been performing soil engineering for the last 45 years. In California, Poormand is registered as a civil engineer and a geotechnical engineer. He specializes in landslide investigation, evaluation, and remediation, and has been involved in the study of over 1,000 landslides. Poormand began working with Leighton & Associates, a consulting firm, in April 1978, and remained there until a couple of years ago, when he retired. Poormand now consults for Leighton. He has visited the Portuguese Bend landslide and the surrounding areas dating back to 1985.

Poormand was involved in several development projects in and around the Portuguese Bend landslide area, including the York Long Point project, located to the west of plaintiffs' lots, in Zone 1. In a 2001 report, which consisted of three volumes, Leighton provided a written report and supporting information about groundwater and data from "borings"—holes drilled into the ground that reveal subsurface conditions. Using multiple cross-sections through the western portion of Zone 2, Leighton determined the factor of safety for 14 of plaintiffs' lots. In July 2006, Leighton prepared an additional report, addressing the factor of safety for the remaining two lots in the eastern portion of Zone 2. Based on these reports, Poormand testified that the safety factor of each lot was 1.5. The safety factor in the active area of the Abalone Cove landslide—in Zone 5—was .888.

The city's principal witness was Glenn Tofani, a geotechnical engineer employed by Geokinetics, a consulting firm. Tofani holds a master of science degree in civil engineering and is registered in California as a geotechnical engineer, a civil engineer, and an environmental assessor. He is also licensed

in California as an engineering contractor, a general building contractor, and a hazardous waste contractor.

Tofani testified that four factors are used in calculating the factor of safety: (1) topography, or ground configuration; (2) location of the ancient landslide "rupture surface"; (3) groundwater level; and (4) the "strength characteristics" of the soil along the rupture surface. He studied these factors by way of three cross-sections through Zone 2—one through the western portion, one through the middle portion, and one through the eastern portion.

To study the topography, Tofani determined the elevation of each cross-section in terms of feet above the mean sea level. For example, the western cross-section showed that the existing ground surface sloped gradually upward from zero feet at the coast to 400 to 500 feet above sea level in the area of plaintiffs' western lots.

In locating the rupture surface of the ancient landslide, Tofani examined numerous "boring data logs," which showed each boring's depth; a description of the material found in the boring, for instance, clay, shale, and slide debris; the probable slide surface; and bedrock. Numerous borings exist in Zones 2 and 5. From this information, Tofani was able to estimate the configuration of the rupture surface running beneath plaintiffs' lots and the distance between the lot surface and the rupture.

Tofani relied on instruments—pressure transducers—installed within the borings to evaluate water pressure and groundwater level. He plotted the groundwater level as it runs beneath plaintiffs' properties.

To determine the strength of the soil, Tofani took a bentonite clay sample from the landslide area and tested it in a "ring sheer" machine. The machine causes the clay to "sheer" just as it would in a landslide, establishing the strength of the soil.

All of the foregoing data was run through a computer program to calculate the factor of safety. The results for each of the three cross-sections in Zone 2 was close to 1.0 or below. As Tofani explained: "These [safety] numbers indicat[e] that the Zone 2 area—based on our measured sheer strengths and the groundwater levels that are out there, and the measured location of the failure surface—should be unstable, and Zone 2 should be moving, and it should not be possible for Zone 2 to stay in place where it is, if the main body of the landslide, down [south], is moving seaward. In other words, if the main body of the landslide moves seaward, this block of ground up here on top of the failure surface that represents Zone 2, cannot stay in place . . . . It has to move in, behind it. It has to follow it." Because the main body of

Abalone Cove and Portuguese Bend are actively moving, "Zone 2 should be following in behind those and Zone 2 should be moving as well, or at least the majority of Zone 2." As to the "totality of the [plaintiffs'] lots," Tofani said, "[o]ur analysis indicates that certainly most, if not all of the lots, have a factor of safety well below 1.5 and, actually, a factor of safety that's on the order of 1.0." He admitted, however, that the factor of safety, as a practical matter, is "subjective," saying that if several geotechnical engineers were given the same data, they would each probably come up with a different factor of safety, varying "in the first decimal point."

Tofani believed that development of the "now current vacant residential lots" in Zone 2—a total of 47 lots—"would have a tendency to . . . further reduce the factor of safety of both Zone 2, as well as the active portion or most active portion . . . of the Abalone Cove landslide." But he did not estimate the amount of the reduction, state when it might occur, or describe the possible consequences.

On cross-examination, Tofani was asked about the risk of human injury. He replied: "I think the risk of someone, for example, falling off a cliff or falling into a crevasse associated with landslide movement, being injured is very low. I think I would characterize the risk, overall, as being very low. [¶] The only caveat I would give is that . . . the rate of slide movement appears to be accelerating. A structure constructed in that area would be likely to be damaged over an extended period of time. And if it wasn't properly maintained, the distress could advance to the point where the structure itself could become dangerous, as far as potentially injuring someone. But aside from that, no, I think the risk of injury is very low."

A portion of Tofani's deposition was then read: " 'Question: . . . How about injury?

" 'Answer: Someone could step in a crack or trip over the crack and become injured. So, sure, it could occur. But . . . I wouldn't liken it to, say, a situation where you've got a property . . . on top of a cliff, where the modes of failure could be very abrupt and catastrophic.' "

Another of the city's experts, Mark McLarty, who is a certified engineering geologist employed by a private consulting firm, testified that the risk of personal injury created by allowing plaintiffs to build homes was "limited." In his words, "There could be some absurd sort of occurrences that are sort of freakish, you might say."

Tofani stated he would not recommend that existing homes in Zone 2 be evacuated because he did not see any current significant risk to the health or

safety of anyone residing there. He said that, consistent with recent trends, landslide movement might be accelerating, in which case damage to property could "occur over a very short period of time." Tofani estimated that structural damage could occur within months or years. At his deposition, read in part at trial, Tofani addressed the same subject, testifying: " 'The rate of movement is slow, and it's somewhat spread out, it would appear.' " That led him to opine at the deposition that if a house were close to a head scarp—the uppermost part of a landslide—or " 'straddled' " a line " 'where you step from active movement to no movement, . . . I think you would see significant structural distress[] within . . . roughly a decade, based on the rate of movement.' " And he agreed that property damage could be repaired if a homeowner properly maintained the dwelling, going so far as to say, "I suppose even if a house were to degrade to the point where it was red-tagged as unsafe, it could be reconstructed."

Tofani was aware that several homes had existed in Zone 2 for 30 to 40 years but did not know of any that were undergoing structural distress. Nor had he seen any "unusual" or "abnormal" cracks in the streets when he was there.

Tofani said "it makes no sense at all" to require that an individual lot owner establish a gross factor of safety for Zone 2. "That would not be a typical requirement," he said. He concurred with the statement that a "lot owner should only have to show 1.5 on his or her lot"—the "standard applies to the property that is being developed." In Tofani's words, "You simply have to look at the property for which development is being proposed."

When asked, "Is it your opinion that Zone 2 is moving," Tofani answered, "The majority of it, yes." In reaching that conclusion, Tofani relied heavily on data gathered from the global positioning system (GPS). The GPS was created by the United States government and utilizes 24 satellites orbiting the earth. The satellites send signals to a receiver, or "survey monument," positioned on the ground, providing highly accurate information as to the monument's location. The GPS became fully operational in 1994. By plotting the data produced by the GPS—in essence, a series of snapshots taken by the satellites—a person can determine if a monument has moved.

There are approximately 105 monuments in the area of the Abalone Cove and Portuguese Bend landslides. Most of them are in Zone 5 (containing the Abalone Cove landslide) and Zone 6 (containing the Portuguese Bend landslide). Approximately seven monuments existed in or close to Zone 2 at the time of trial, three of which were in the northern area near plaintiffs' lots. The remaining four monuments were in the southern part of Zone 2, along the border with Zone 5.

One of the monuments in the northern area, known as AB-17, was in the western cluster of plaintiffs' nine lots; another monument, AB-18, was in the north-central cluster of five lots; and a third, AB-53, was near the two lots to the east. According to Tofani, the data for AB-17, gathered from November 11, 1994, to September 6, 2006, showed that the monument had not moved. During the same period, AB-18 had moved 2.96 inches, or slightly less than an average of .25 inches a year; it had moved to the southeast, but the active portions of the Abalone Cove and Portuguese Bend landslides were moving to the southwest. Finally, the GPS data on AB-53, collected from March 22, 2002, to September 8, 2006, showed movement of 3.38 inches to the southwest, an average of .75 inches a year.

The GPS data on the four monuments near the dividing line between Zone 2 and Zone 5 showed movement as follows, going from west to east: (1) AB-16, 2.04 inches due south, from November 30, 1994, to September 11, 2006; (2) AB-15, 6.02 inches to the southwest, for the same period; (3) AB-23, 2.8 inches to the southwest, from September 17, 1997, to September 6, 2006; and (4) AB-52, 3.41 inches to the southwest, from March 22, 2002, to September 6, 2006.

Tofani's use of the GPS data—on these seven monuments and several others in the ancient landslide area—convinced him that "the largest portion or the majority of Zone 2 is actively moving." And he concluded that the rate of movement will probably increase. In evaluating the GPS data, Tofani used a margin of error of one inch—if the data showed movement of one inch or less for the entire period, he viewed it as within the range of possible error and did not treat it as any movement at all.

Plaintiffs presented rebuttal evidence with respect to the GPS data, focusing in particular on AB-18, the monument near the five north-central lots. Robert Douglas, who holds a doctorate in geology and is a professor of earth science at the University of Southern California, is the chairman of the board of the Abalone Cove Landslide Abatement District, commonly known as ACLAD. Created by the Legislature in 1980, ACLAD is a quasi-governmental agency charged with implementing measures to abate the movement of the Abalone Cove landslide. It operates independently of the city. ACLAD accomplishes its task primarily though dewatering wells and the maintenance of a storm drain system. Douglas has been a member of ACLAD's board of directors since 1997.

ACLAD routinely analyzes GPS data, which it obtains from the same source as Tofani. Douglas testified that when the sewer system was being installed in 2000 and 2001, he became concerned because AB-18 was located near the construction site. He went to the site and discovered that the

monument had been moved; he could not find it. As a result, ACLAD's board concluded that AB-18 had been "displaced" and "compromised," and no longer provided valid data. On behalf of ACLAD, Douglas so informed the city. At trial, ACLAD produced an "ACLAD GPS Network" map, showing that AB-18 was considered a "displaced" station. Douglas also testified that, having reviewed GPS data, ACLAD did not have "any evidence that Zone 2 is moving in the vicinity of any of the plaintiffs' properties."

During his direct testimony, Foster testified that ACLAD does not include AB-18 data in its measurement assessments. He examined GPS data and learned that AB-18's period of "movement" coincided with the installation of the sewer system during 2000 to 2001—when AB-18 was physically removed and replaced. Foster explained that the GPS data on AB-18 was not reliable for that period. Further, with the unreliable data excluded, the remaining data fell "within the margin of error, showing no movement [of AB-18] whatso-ever"; Foster used a 1.5-inch margin of error. ACLAD has taken an official position that the margin of error on GPS data is at least two inches, sometimes four.

As stated in the CSA report, completed in January 2002: "Seven GPS stations are located within [Zone 2]. These stations do not appear to display significant downslope displacement. In detail, however, it appears that the [Zone 2] GPS stations that closely border the headscarp area of the [Abalone Cove landslide, near Zone 5] . . . all exhibit slight instability and downslope movement when subject to a significant rainfall. This tendency was revealed in the El Niño year of 1998 when movement in all five stations was two to three times larger in magnitude than any of the previous movements, and it was directed downslope. [W]ith the exception of the movement during the 1998 El Niño year, no pattern of downslope movement exists. However, it appears that movement in the northern margin of the [Abalone Cove land-slide] may influence the southern, or downslope, region of the Zone 2 landslide terrane.

"The two GPS stations in the northern portion of Zone 2, AB17 and AB18, show no distinguishable movement. . . . [T]hese two stations did not show any increased movement during the El Niño year of 1998. The general east-west and north-south wanderings of . . . these stations are indicative of subtle errors of measurement."

In surrebuttal, the city relied on two witnesses in an attempt to prove that the GPS data on AB-18—showing the monument had moved 2.96 inches in about 12 years—was attributable to a gradual but accelerating landslide, not removal or displacement of the monument during the sewer construction.

In late January 2007, in the midst of trial, the parties settled plaintiffs' temporary takings claim, leaving the permanent takings claim for determination.

## H. *Statement of Decision*

On April 27, 2007, the trial court issued its *proposed* statement of decision, finding that, where in conflict, plaintiffs' witnesses lacked credibility while Tofani's testimony was compelling and persuasive. The court criticized Foster's conclusion that Zone 2 was stable because he failed to account for the continuing slide activity outside the zone and improperly concluded that Zone 2 was flat. Although Chang's *testimony* was "emphatic" at times, some of his *opinions* were "not emphatic at all." The trial court agreed with Poormand in part but rejected his conclusion that plaintiffs' lots had a safety factor of 1.5. Poormand's conclusion rested on the Abalone Cove landslide area "remaining in place, an assumption which has been shown to be questionable at best."

In the trial court's view, the GPS data supported Tofani's opinion that the factor of safety in Zone 2 was less than 1.5 and that most of the zone was moving. The trial court found that plaintiffs' challenge to the GPS data on AB-18—the monument supposedly displaced during the sewer construction—was "unpersuasive and unsupported by documented evidence." Tofani's opinion about the stability of Zone 2 was consistent with the city's building code, which requires a safety factor of at least 1.5. That specific safety factor is also recognized by geotechnical professionals as the minimum necessary for residential construction.

Based on a review of the testimony *and* the documentary evidence, the trial court concluded that "*at best there remains uncertainty* with respect to the stability of the geology of Zone 2 and the surrounding areas within the Ancient Portuguese Landslide area." (Italics added.) Noting that the Portuguese Bend and Abalone Cove landslides had led to litigation against the government requiring "large sums to resolve," the trial court commented, "A public entity is not required to risk bankruptcy in order to satisfy the unsubstantiated beliefs of property owners that development is safe in an area with less than geotechnically acceptable measurements."

The court ultimately concluded that plaintiffs' claim of a permanent taking failed because, under state nuisance law, "the potential for significant land movement in Zone 2, however minor, can only be deemed to constitute . . . a substantial and reasonable interference [with collective social interests]." The court also found that the moratorium did "not go too far in regulating plaintiffs' . . . interests" in light of its important nature, its negligible effect on permitted uses, and its lack of interference with plaintiffs' reasonable investment-backed expectations.

As directed by the trial court, the city prepared a *final* statement of decision. By order dated July 11, 2007, the trial court adopted the city's final statement of decision as its own except for any portion that was inconsistent with the court's April 27, 2007 proposed decision.

On July 18, 2007, the trial court entered judgment in favor of the city, expressly referring to its own April 27, 2007 proposed statement of decision, not the final statement of decision. Regardless, there was no material difference between the two decisions. Plaintiffs appealed.

## II

## DISCUSSION

Plaintiff's takings claim is based on the state takings clause. The California Constitution provides: "Private property may be *taken or damaged* for public use only when just compensation . . . has first been paid to, or into the court for, the owner." (Cal. Const., art. I, § 19, italics added.) In comparison, the federal Constitution states: "[N]or shall private property be *taken* for public use, without just compensation." (U.S. Const., 5th Amend., italics added.)

■ "Because the California Constitution requires compensation for damage as well as a taking, the California clause ' "protects a somewhat broader range of property values" than does the corresponding federal provision. . . .' . . . Aside from that difference, California courts have construed the clauses congruently. . . . Thus courts have analyzed takings claims under decisions of both the California and United States Supreme Courts." (*County of Ventura v. Channel Islands Marina, Inc.* (2008) 159 Cal.App.4th 615, 624 [71 Cal.Rptr.3d 762], citations omitted; accord, *San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 664 [117 Cal.Rptr.2d 269, 41 P.3d 87].) The present case involves only the takings aspect of the state clause; the "damaged property" provision is not implicated.

" 'The Takings Clause . . . preserves governmental power to regulate, subject only to the dictates of " 'justice and fairness.' " . . . There is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate. Formulas and factors have been developed in a variety of settings. . . . Resolution of each case, however, . . . calls as much for the exercise of judgment as for the application of logic.' " (*Action Apartment Assn. v. Santa Monica Rent Control Bd., supra*, 94 Cal.App.4th at p. 601.)

Here, the trial court did not find a permanent taking because of two erroneous conclusions. First, it reasoned that the moratorium was not "permanent" given that plaintiffs could seek an exclusion under the moratorium by

establishing a gross safety factor of at least 1.5 through the city's administrative process. Second, it stated that the risk of significant land movement, no matter how small, was contrary to collective social interests and could be remedied under state nuisance law. The first conclusion was precluded by the law of the case and was inconsistent with the trial court's findings of fact. The second conclusion—assuming it to be based on a correct statement of the law—was not supported by substantial evidence. As we shall explain, the trial court's express and implied findings prove that the city exacted a permanent taking of plaintiffs' properties.

## A.   Standard of Review

"A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].) "Under the substantial evidence standard of review, our review begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the trial court's factual determinations. . . . Substantial evidence is evidence of ponderable legal significance, reasonable in nature, credible, and of solid value. . . . The substantial evidence standard of review applies to both express and implied findings of fact made by the court in its statement of decision." (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 501 [61 Cal.Rptr.3d 754], citations omitted.)

Whether there was a permanent taking in violation of the California Constitution is a question of law we review de novo. (See *Ali v. City of Los Angeles* (1999) 77 Cal.App.4th 246, 250 [91 Cal.Rptr.2d 458].)

## B.   Takings Law

■    "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property. . . . [¶]. [But] government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and . . . such 'regulatory takings' may be compensable under the Fifth Amendment." (*Lingle v. Chevron U. S. A. Inc.* (2005) 544 U.S. 528, 537 [161 L.Ed.2d 876, 125 S.Ct. 2074, 2081] (*Lingle*).)

The United States Supreme Court has recognized two types of regulatory action that typically will be deemed categorical takings. "First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation." (*Lingle,*

*supra*, 544 U.S. at p. 538 [125 S.Ct. at p. 2081].) Such a taking occurs, for example, if a "state law requir[es] landlords to permit cable companies to install cable facilities in apartment buildings." (*Ibid.*, citing *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 [73 L.Ed.2d 868, 102 S.Ct. 3164] (*Loretto*).) "A second categorical rule applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." (*Lingle*, at p. 538 [125 S.Ct. at p. 2081], quoting *Lucas, supra*, 505 U.S. at p. 1027 [112 S.Ct. at p. 2899].) Under *Lucas*, "the government must pay just compensation for such 'total regulatory takings,' except to the extent that 'background principles of nuisance and property law' independently restrict the owner's intended use of the property." (*Lingle*, at p. 538 [125 S.Ct. at p. 2081], quoting *Lucas*, at pp. 1026–1032 [112 S.Ct. at pp. 2899–2902].)

"Outside these two relatively narrow [types of categorical takings], regulatory takings challenges are governed by the [factors] set forth in *Penn Central Transp. Co.* v. *New York City* [(1978)] 438 U.S. 104 [57 L.Ed.2d 631, 98 S.Ct. 2646] . . . ." (*Lingle, supra*, 544 U.S. at p. 538 [125 S.Ct. at p. 2081].) "Primary among those factors are '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.' " (*Id.* at pp. 538–539 [125 S.Ct. at pp. 2081–2082], quoting *Penn Central*, at p. 124 [98 S.Ct. at p. 2659].) "In addition, the 'character of the governmental action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good'—may be relevant in discerning whether a taking has occurred." (*Lingle*, at p. 539 [125 S.Ct. at p. 2082], quoting *Penn Central*, at p. 124 [98 S.Ct. at p. 2659].) "The *Penn Central* factors . . . have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules." (*Lingle*, at p. 539 [125 S.Ct. at p. 2082].)

▮ "Although [the Court's] regulatory takings jurisprudence cannot be characterized as unified, these three inquiries (reflected in *Loretto*, *Lucas*, and *Penn Central*) share a common touchstone. Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights. The Court has held that physical takings require compensation because of the unique burden they impose: A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property—perhaps the most fundamental of all property interests. . . . In the *Lucas* context, of course, the complete elimination of a property's value is the determinative factor. . . . And the

*Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." (*Lingle, supra,* 544 U.S. at pp. 539–540 [125 S.Ct. at p. 2082], citations omitted.)

Here, the trial court applied both the *Lucas* and *Penn Central* tests in concluding that there was not a permanent taking. Because we hold that, under *Lucas*, there was such a taking, we do not apply the *Penn Central* factors.

In *Lucas, supra*, 505 U.S. 1003, David Lucas bought two lots along the South Carolina coast in 1986, intending to build single-family homes. At the time, the state's Coastal Zone Management Act was in effect, under which the South Carolina Coastal Council was authorized to prevent erosion and preserve beaches. In 1988, the legislature passed the Beachfront Management Act, directing the council to establish a "baseline" demarking the points of erosion along the coast. After the baseline was established, Lucas could not build because his lots were seaward of the line.

In support of the Beachfront Management Act, the state legislature made several findings, including: (1) " 'The beach/dune system along the coast of South Carolina is extremely important to the people of this State . . .' "; (2) " '[D]evelopment unwisely has been sited too close to the [beach/dune] system[, and this] type of development has jeopardized the stability of the beach/dune system, accelerated erosion, and endangered adjacent property' "; (3) " 'The use of armoring in the form of hard erosion control devices such as seawalls, bulkheads, and rip-rap to protect erosion-threatened structures adjacent to the beach has not proven effective[, and in] reality, these hard structures, in many instances, have increased the vulnerability of beachfront property to damage from wind and waves while contributing to the deterioration and loss of the dry sand beach which is so important to the tourism industry' "; and (4) " '[The beach/dune system requires] space to accrete and erode in its natural cycle[, and this] space can be provided only by discouraging new construction in close proximity to the beach/dune system . . . .' " (*Lucas, supra*, 505 U.S. at pp. 1020–1021 & fn. 10 [112 S.Ct. at p. 2896 & fn. 10].)

Two years after buying his property, Lucas filed suit in state court, alleging a takings claim based on the construction ban. The trial court found that there was a taking. The South Carolina Supreme Court reversed, concluding that compensation was not owed when a regulation is designed " 'to prevent serious public harm.' " (*Lucas, supra*, 505 U.S. at p. 1010 [112 S.Ct. at p. 2890].) The state supreme court believed that it was bound by the uncontested findings of the state legislature. (*Ibid.*)

■ The United States Supreme Court reversed. First, the court held that "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." (*Lucas, supra*, 505 U.S. at p. 1019 [112 S.Ct. at p. 2895].) The court rejected the contention that Lucas's property retained *some* economically beneficial use just because he could go there to picnic, swim, camp in a tent, or live in a movable trailer. (See *id.* at p. 1044 [112 S.Ct. at p. 2908] (dis. opn. of Blackmun, J.).)

Second, the court concluded that the findings of the state legislature were of no import in deciding the takings issue. "Any limitation so severe [as to deprive land of all economically beneficial use] cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership. A law or decree with such an effect must, in other words, do no more than duplicate the result that could have been achieved in the courts—by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise." (*Lucas, supra*, 505 U.S. at p. 1029 [112 S.Ct. at p. 2900].) The court's use of "otherwise" referred to "litigation absolving the State (or private parties) of liability for the destruction of 'real and personal property, in cases of actual necessity, to prevent the spreading of a fire' or to forestall other grave threats to the lives and property of others." (*Lucas*, at p. 1029, fn. 16 [112 S.Ct. at p. 2900, fn. 16].)

The court explained: "On this analysis, the owner of a lakebed, for example, would not be entitled to compensation when he is denied the requisite permit to engage in a landfilling operation that would have the effect of flooding others' land. Nor [would] the corporate owner of a nuclear generating plant [be compensated], when it is directed to remove all improvements from its land upon discovery that the plant sits astride an earthquake fault. Such regulatory action may well have the effect of eliminating the land's only economically productive use, but it does not proscribe a productive use that was previously permissible under relevant property and nuisance principles. The use of these properties for what are now expressly prohibited purposes was *always* unlawful, and (subject to other constitutional limitations) it was open to the State at any point to make the implication of those background principles of nuisance and property law explicit." (*Lucas, supra*, 505 U.S. at pp. 1029–1030 [112 S.Ct. at pp. 2900–2901].)

Third, in examining the factors that would resolve the takings claim, the court relied on common law principles. "The 'total taking' inquiry we require today will ordinarily entail (as the application of state nuisance law ordinarily

entails) analysis of, among other things, the degree of harm to public lands and resources, or adjacent private property, posed by the claimant's proposed activities, . . . the social value of the claimant's activities and their suitability to the locality in question, . . . and the relative ease with which the alleged harm can be avoided through measures taken by the claimant and the government (or adjacent private landowners) alike . . . . The fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common-law prohibition (though changed circumstances or new knowledge may make what was previously permissible no longer so . . . [)]. So also does the fact that other landowners, similarly situated, are permitted to continue the use denied to the claimant. [¶] It seems unlikely that common-law principles would have prevented the erection of any habitable or productive improvements on [Lucas's] land; they rarely support prohibition of the 'essential use' of land . . . ." (*Lucas, supra*, 505 U.S. at pp. 1030–1031 [112 S.Ct. at p. 2901] (maj. opn. of Scalia, J.), citations omitted; see *id.* at p. 1052, fn. 15 [112 S.Ct. at p. 2912, fn. 15] (dis. opn. of Blackmun, J.) [majority's reference to state nuisance and property law is to common law, not legislative enactments]; *id.* at pp. 1052–1055 [112 S.Ct. at pp. 2912–2914] (dis. opn. of Blackmun, J.) [criticizing majority's resort to common law principles and failure to consider statutes].)

Last, the court made clear that in the case of a categorical regulatory taking, the government bears the burden of proving that the property owner's intended use is not allowed under state law. "We emphasize that to win its case South Carolina must do more than proffer the legislature's declaration that the uses Lucas desires are inconsistent with the public interest, or the conclusory assertion that they violate a common-law maxim such as *sic utere tuo ut alienum non laedas*[, that is, ' "one must so use his rights as not to infringe on the rights of others." ' (*In re Englebrecht* (1998) 67 Cal.App.4th 486, 492 [79 Cal.Rptr.2d 89].)] . . . Instead, as it would be required to do if it sought to restrain Lucas in a common-law action for public nuisance, South Carolina must identify background principles of nuisance and property law that prohibit the uses he now intends in the circumstances in which the property is presently found. Only on this showing can the State fairly claim that, in proscribing all such beneficial uses, the Beachfront Management Act is taking nothing." (*Lucas, supra*, 505 U.S. at pp. 1031–1032 [112 S.Ct. at pp. 2901–2902].)

On remand, the South Carolina Supreme Court held: "We have reviewed the record and heard arguments from the parties regarding whether Coastal Council possesses the ability under the common law to prohibit Lucas from constructing a habitable structure on his land. Coastal Council has not persuaded us that any common law basis exists by which it could restrain Lucas's desired use of his land; nor has our research uncovered any such common law principle. We hold that the sole issue on remand from this Court

to the circuit level is a determination of the [remedy for the takings violation]." (*Lucas v. S.C. Coastal Council* (1992) 309 S.C. 424, 427 [424 S.E.2d 484, 486].)

C. *California Common Law Nuisance Doctrine*

We first distinguish between a public and a private nuisance because the city can prevail only if plaintiffs' development of their lots would constitute a nuisance or violate property law.

1. *Public Nuisance*

■ "In the public nuisance context, the community's right to security and protection must be reconciled with the individual's right to expressive and associative freedom. Reconciliation begins with the acknowledgment that the interests of the community are not invariably less important than the freedom of individuals. . . . [T]he security and protection of the community is the bedrock on which the superstructure of individual liberty rests. . . . By entering society, individuals give up the unrestrained right to act as they think fit; in return, each has a positive right to society's protection. . . .

"There are few 'forms of action' in the history of Anglo-American law with a pedigree older than suits seeking to restrain nuisances, whether public or private. Actions to abate private nuisances by injunction are the oldest of these apparent twins, which have almost nothing in common except the word 'nuisance' itself. Unlike the private nuisance—tied to and designed to vindicate individual ownership interests in *land*—the 'common' or *public* nuisance emerged from distinctly different historical origins. The public nuisance doctrine is aimed at the protection and redress of *community* interests and, at least in theory, embodies a kind of collective ideal of civil life which the courts have vindicated by equitable remedies since the beginning of the 16th century." (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1102–1103 [60 Cal.Rptr.2d 277, 929 P.2d 596].)

"With the publication of the Restatement Second of Torts in 1965, the law of public nuisances had crystallized to such an extent that its features could be clearly delineated. Section 821B of Restatement Second of Torts identifies five general categories of 'public rights,' the unreasonable interference with which may constitute a public nuisance: 'the public health, the public safety, the public peace, the public comfort or the public convenience.' (Rest.2d Torts, § 821B, subd. (2)(a).) A 'public right,' according to the Restatement Second, 'is one common to all members of the general public. It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured.' (*Id.,* com. g, p. 92.)

"In California, the early *common law* categories of public nuisance, *codified in 1872 and still applicable*, define anything that is 'injurious to health, . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway,' as a nuisance. (Civ. Code, § 3479.)" (*People ex rel. Gallo v. Acuna, supra*, 14 Cal.4th at p. 1104, italics added.)

■ "It is this *community* aspect of the public nuisance . . . that distinguishes it from its private cousin, and makes possible its use, by means of the equitable injunction, to protect the quality of organized social life. Of course, not every interference with collective social interests constitutes a public nuisance. To qualify, and thus be enjoinable, the interference must be both *substantial* and *unreasonable*. . . . ' "Practically all human activities unless carried on in a wilderness interfere to some extent with others or involve some risk of interference, and these interferences range from mere trifling annoyances to serious harms. It is an obvious truth that each individual in a community must put up with a certain amount of annoyance, inconvenience and interference and must take a certain amount of risk in order that all may get on together." ' . . .

"The Restatement Second formulates the requirement of substantiality as proof of 'significant harm,' defined as a 'real and appreciable invasion of the plaintiff's interests,' one that is 'definitely offensive, seriously annoying or intolerable.' (Rest.2d Torts, § 821F, coms. c & d, pp. 105–106.) The measure is an objective one: 'If normal persons in that locality would not be substantially annoyed or disturbed by the situation, then the invasion is not a significant one . . . .' (*Id.*, com. d, p. 106.) The unreasonableness of a given interference represents a judgment reached by comparing the social utility of an activity against the gravity of the harm it inflicts . . . . Here again, the standard is an objective one: '[T]he question is not whether the particular plaintiff found the invasion unreasonable, but "whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable." ' " (*People ex rel. Gallo v. Acuna, supra*, 14 Cal.4th at p. 1105, citations omitted; cf. *People v. McDonald* (2006) 137 Cal.App.4th 521, 537–538 [40 Cal.Rptr.3d 422] [showing of significant harm not necessary in criminal prosecution of public nuisance such as urinating in public].)

■ "At common law public nuisance came to cover a large, miscellaneous and diversified group of minor criminal offenses, all of which involved some interference with the interests of the community at large—interests that were recognized as rights of the general public entitled to protection. Thus public nuisances included interference with the public health, as in the case of

keeping diseased animals or the maintenance of a pond breeding malarial mosquitoes; with the public safety, as in the case of the storage of explosives in the midst of a city or the shooting of fireworks in the public streets; with the public morals, as in the case of houses of prostitution or indecent exhibitions; with the public peace, as by loud and disturbing noises; with the public comfort, as in the case of widely disseminated bad odors, dust and smoke; with the public convenience, as by the obstruction of a public highway or a navigable stream; and with a wide variety of other miscellaneous public rights of a similar kind. In each of these instances the interference with the public right was so unreasonable that it was held to constitute a criminal offense. For the same reason it also constituted a tort. Many states no longer recognize common law crimes, treating the criminal law as entirely statutory. But the common law tort of public nuisance still exists . . . ." (Rest.2d Torts, § 821B, com. b, p. 88.)

## 2. *Private Nuisance*

■ "Unlike public nuisance, which is an interference with the rights of the community at large, private nuisance is a civil wrong based on disturbance of rights in land. . . . A nuisance may be both public and private, but to proceed on a private nuisance theory the plaintiff must prove an injury specifically referable to the use and enjoyment of his or her land. The injury, however, need not be different in kind from that suffered by the general public. . . .

"Examples of interferences with the use and enjoyment of land actionable under a private nuisance theory are legion. 'So long as the interference is substantial and unreasonable, and such as would be offensive or inconvenient to the normal person, virtually any disturbance of the enjoyment of the property may amount to a nuisance.' . . . An interference need not directly damage the land or prevent its use to constitute a nuisance; private plaintiffs have successfully maintained nuisance actions against airports for interferences caused by noise, smoke and vibrations from flights over their homes . . . and against a sewage treatment plant for interference caused by noxious odors . . . ." (*Koll-Irvine Center Property Owners Assn. v. County of Orange* (1994) 24 Cal.App.4th 1036, 1041 [29 Cal.Rptr.2d 664], citations omitted.)

■ "In distinction to trespass, liability for nuisance does not require proof of damage to the plaintiff's property; proof of interference with the plaintiff's use and enjoyment of that property is sufficient. . . . In further distinction to trespass, however, liability for private nuisance requires proof of two additional elements. . . .

"The first additional requirement for recovery . . . on a nuisance theory is proof that the invasion of the plaintiff's interest in the use and enjoyment of the land was *substantial*, i.e., that it caused the plaintiff to suffer 'substantial actual damage.' . . . The Restatement recognizes the same requirement as the need for proof of 'significant harm' (Rest.2d Torts, § 821F), which it variously defines as 'harm of importance' and a 'real and appreciable invasion of the plaintiff's interests' (*id.,* com. c, p. 105) and an invasion that is 'definitely offensive, seriously annoying or intolerable' (*id.,* com. d, p. 106). The degree of harm is to be judged by an objective standard, i.e., what effect would the invasion have on persons of normal health and sensibilities living in the same community? . . . 'If normal persons in that locality would not be substantially annoyed or disturbed by the situation, then the invasion is not a significant one, even though the idiosyncrasies of the particular plaintiff may make it unendurable to him.' (Rest.2d Torts, § 821F, com. d, p. 106.) This is, of course, a question of fact that turns on the circumstances of each case.

"The second additional requirement for nuisance is superficially similar but analytically distinct: 'The interference with the protected interest must not only be substantial, but it must also be *unreasonable*' . . . , i.e., it must be 'of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land.' . . . The primary test for determining whether the invasion is unreasonable is whether the gravity of the harm outweighs the social utility of the defendant's conduct . . . . Again the standard is objective: the question is not whether the particular plaintiff found the invasion unreasonable, but 'whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable.' " (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 937–938 [55 Cal.Rptr.2d 724, 920 P.2d 669], citations omitted.)

## D. *The City Exacted a Permanent Taking*

Because the city deprived plaintiffs' land of all economically beneficial use without proving a justification therefor under state principles of nuisance or property law, it has violated the state takings clause.

### 1. *The Resolution's Effect on the Use of Plaintiffs' Properties*

As zoned, plaintiffs' properties may be used only to build single-family homes. Under the city's resolution, lot owners must prove that Zone 2 has a factor of safety of 1.5 or higher—a *gross* safety factor—to obtain an exclusion from the moratorium. Before passage of the resolution, a lot owner had to show only the "geologic conditions" of his or her individual lot—a *local* safety factor.

The trial court found that the moratorium was conditional and temporary, and thus not a permanent taking (see *Tahoe-Sierra Preservation Council,*

*Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 329–338 [152 L.Ed.2d 517, 122 S.Ct. 1465, 1482–1487]), because plaintiffs would be allowed to build if they could convince the city that Zone 2 had a safety factor of at least 1.5. Yet, to accomplish that task, plaintiffs would have to go through the city's administrative process.

But in *Monks I*, we held that plaintiffs were excused from exhausting their administrative remedies—from having to establish a *gross* safety factor of 1.5—on the ground of futility. The city council had already decided that Zone 2 had a safety factor *less than* 1.5 and was not going to be persuaded otherwise. We stated that plaintiffs should not be required to pay between $500,000 and $1 million to conduct a study in an attempt to prove what the city would not believe. Thus, the use of the administrative process was pointless. (See *Monks I, supra*, B172698.) Under the doctrine of law of the case, the trial court should not have revisited this issue at trial. (See *ABF Capital Corp. v. Grove Properties Co.* (2005) 126 Cal.App.4th 204, 212 [23 Cal.Rptr.3d 803].)

The city contends that the law of the case is not applicable because the evidence at the trial differed substantially from what was presented at the earlier hearing reviewed in *Monks I*. (See *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 301–302 [253 Cal.Rptr. 97, 763 P.2d 948]; *Wicktor v. County of Los Angeles* (1960) 177 Cal.App.2d 390, 394–395 [2 Cal.Rptr. 352].) We disagree. The gist of the evidence did not change. At the trial, plaintiffs simply offered *more* evidence that a *local* safety factor was geologically acceptable and that their lots had a safety factor of at least 1.5; the city asserted again that, under the resolution, plaintiffs had to prove a *gross* safety factor and offered *more* evidence that the safety factor of Zone 2 was less than 1.5. And no one, including Poormand, provided any additional evidence about the cost of determining the *gross* safety factor of *Zone* 2. In these circumstances, it would make a mockery of the principle of finality (see *Nally*, at p. 302) if, after we remanded the takings claim for a trial on the merits, the trial court found instead that plaintiffs should seek an exclusion under the resolution a second time, using the same administrative process as before.

Assuming for the sake of argument that the law of the case does not apply here, the city fares no better. The trial court suggested that plaintiffs could attempt to establish a *gross* safety factor of 1.5—as required under the resolution—by relying on Poormand's testimony. There are two problems with this suggestion. First, Poormand testified that each of plaintiffs' *lots* had a safety factor of 1.5—a *local* safety factor. He did not address the *gross* safety factor of Zone 2. His opinion would therefore be irrelevant in obtaining an exclusion under the resolution. Second, the trial court specifically rejected Poormand's opinion on the subject of safety factors, and the

city has vigorously opposed his opinion at trial and on appeal. Indeed, the city's principal witness, Tofani, testified that the majority of Zone 2 should be moving, indicating a *gross* safety factor below 1.0. There is no reason to believe that, in the administrative process, the city would change its position, agree with Poormand's testimony about the safety factor of the 16 *lots,* and then jump to the unsupported conclusion that *Zone 2, in its entirety,* has a safety factor of 1.5.

Nor is the resolution's severe restriction on plaintiffs' properties ameliorated by the allowance of a "temporary minor nonresidential structure[]" that does not exceed 320 square feet, does not increase water usage, and has a nonhabitable purpose. In *Lucas,* the owner's undeveloped beachfront lots could still be used for picnicking, swimming, camping, or living in a movable trailer. Yet the high court found that *all* economically beneficial use of the property had been sacrificed.

Finally, Tofani's testimony undermines the validity of the resolution. He testified that "it makes no sense at all" to require a lot owner to establish the safety factor of the entire zone. "That would not be a typical requirement," he said. "You simply have to look at the property for which development is being proposed." And Foster, one of plaintiffs' expert witnesses, agreed: "Typically you would want to establish [a] factor of safety for *your* property." (Italics added.) He said it would not be "relevant" for an individual lot owner to show the safety factor for other parts of Zone 2.

Consequently, the remainder of our inquiry follows the law applicable to a categorical taking, also known as a *Lucas* taking, total taking, or per se taking. (See *ConocoPhillips Co. v. Henry* (N.D.Okla. 2007) 520 F.Supp.2d 1282, 1306; *Lucas, supra,* 505 U.S. at pp. 1030–1031 [112 S.Ct. at p. 2901]; *Lingle, supra,* 544 U.S. at p. 538 [125 S.Ct. at p. 2081].) In short, we must determine whether the moratorium is justified by state principles of nuisance or property law. (See *Lucas, supra,* 505 U.S. at pp. 1029–1031 [112 S.Ct. at pp. 2900–2901].) The city invokes only nuisance law.

### 2. *Plaintiffs' Intended Property Use Is Not a Nuisance*

The construction of homes on plaintiffs' lots must pose a significant harm to persons or property to constitute a public or private nuisance. (See, e.g., *People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at p. 1105; *San Diego Gas & Electric Co. v. Superior Court, supra,* 13 Cal.4th at pp. 937–938.) But that element of a nuisance is not satisfied here. Thus, nuisance law does not support the moratorium.

At the outset, we note that the burden is on the city to prove that the moratorium is justified by state nuisance law. (See *Lucas, supra,* 505 U.S. at

pp. 1031–1032 [112 S.Ct. at pp. 2901–2902].) Further, "[i]t seems unlikely that common-law principles would have prevented the erection of any habitable or productive improvements on [the] land; they rarely support prohibition of the 'essential use' of land . . . ." (*Lucas, supra,* 505 U.S. at p. 1031 [112 S.Ct. at p. 2901].)

In essence, the city must show that, under common law nuisance principles, it could obtain an injunction against the construction of homes on plaintiffs' lots. (See *Lucas, supra,* 505 U.S. at pp. 1029, 1031–1032 [112 S.Ct. at pp. 2900, 2901–2902].) In obtaining such relief, the city would have to establish a reasonable probability of prevailing on the merits of its nuisance claim. (See *Citizens for Better Streets v. Board of Supervisors* (2004) 117 Cal.App.4th 1, 6 [11 Cal.Rptr.3d 349].) For several reasons, we conclude it could not do so.

First, there is nothing inherently harmful about plaintiffs' desired use of their properties: to build homes. The lots are zoned solely for that purpose. The area was subdivided decades ago. And the city has installed the requisite utilities, including a sewer system.

Second, the trial court concluded that "at best there remains *uncertainty* with respect to the stability of the geology of Zone 2 and the surrounding areas within the Ancient Portuguese Landslide area." (Italics added.) "Uncertainty" is not a sufficient basis for depriving a property owner of a home. The city must establish a reasonable probability of significant harm to obtain an injunction against a nuisance. The trial court's determination that the stability of Zone 2 is "uncertain" does not meet that standard. (See *Martin v. Helstad* (7th Cir. 1983) 699 F.2d 387, 391 [injunction improper where success on merits is "uncertain"]; *Public Interest Research Group of Mich. v. Brinegar* (6th Cir. 1975) 517 F.2d 917, 918 [same]; *Warner Lambert Co. v. McCrory's Corp.* (D.N.J. 1989) 718 F.Supp. 389, 399 [same]; *Van Deusen v. McManus* (N.Y.App.Div. 1994) 202 A.D.2d 731, 733 [608 N.Y.S.2d 569, 570] [same].) The court's "uncertainty" finding is demonstrated by the following evidence. According to GPS data, monument AB-17 showed that the western cluster of plaintiffs' lots was not moving. Monument AB-18, in the central cluster of the lots, showed no movement given that it was displaced during the construction of the sewer system; the trial court's contrary finding was not supported in light of plaintiffs' rebuttal evidence: the personal observations of Douglas, the corresponding calculations by Foster, and the formal position of ACLAD. As for the monument closest to the two eastern lots, AB-53, the data showed average movement of less than one inch per year, albeit accelerating. But AB-53 was located about 200 feet from plaintiffs' lots and was situated on developed property. No one explained

what these variables—distance and an intervening dwelling—meant in applying the data to plaintiffs' properties. And ACLAD, which periodically reviewed GPS data, had seen no evidence that Zone 2 was moving in the vicinity of plaintiffs' lots. The CSA report, commissioned by the city, reached the same conclusion. Tofani said his analysis indicated that the area of plaintiffs' lots "should" be moving. Yet, as stated by the trial court, an expert opinion couched in terms of "should" is not sufficiently "emphatic" to be given any weight.

Third, in applying nuisance law, it is important to examine the risk of harm suggested by Zone 2's factor of safety. Tofani was the only witness to opine that Zone 2—the majority of it—was moving. He calculated various safety factors for the zone—the lowest of any witness—and described the *effects* associated with those calculations. Tofani testified that a house would sustain significant structural damage in about a *decade* if it was close to the uppermost part of a landslide or straddled a line demarking movement on one side and no movement on the other. None of plaintiffs' lots is anywhere near such an area, indicating their homes would take longer than a decade to become distressed. Tofani also stated that even severe structural damage—as illustrated by a red-tagged house—could be repaired. In that regard, plaintiffs' evidence showed that, in 2005, the city approved the construction of a new foundation for a distressed home in Zone 5 even though that zone has a safety factor less than 1.0 and is moving. With respect to personal injury, Tofani said the risk was "very low," giving as an example someone tripping over a crack. Neither Foster nor Tofani was aware of any unusual cracks near plaintiffs' properties. Tofani also said that personal injury could result from a deteriorated structure, but there was no evidence that plaintiffs would allow their homes to decline to such an extent. Tofani did not see any need to evacuate existing homes because there was currently no significant risk to the health or safety of anyone living in Zone 2. Another city witness, McLarty, described the risk of personal injury as "limited" to some sort of "freakish occurrence."

Fourth, the city correctly points out that it may obtain an injunction requiring a property owner to remove a dangerous condition from his land or to stabilize his property to prevent a portion of his land from sliding onto a neighbor's yard. (See *People v. Greene* (1968) 264 Cal.App.2d 774, 778 [70 Cal.Rptr. 818]; *Rhodes v. San Mateo Investment Co.* (1955) 130 Cal.App.2d 116 [278 P.2d 447].) Yet the city does not explain how such an injunction would be of assistance here. This case involves block glides—*large blocks of earth* that move slowly along a *single plane.* According to Foster, whose testimony on this issue was not challenged, a block glide generally presents no risk of harm to people. The city does not contend that if construction is allowed, one of plaintiffs' lots might slide onto an adjacent lot or that one of plaintiffs' homes might slide into the ocean. This case is not comparable to

the sudden breakaway of the 18th hole at the Ocean Trails Golf Course. Rather, the gist of the city's nuisance theory is that, if an undeveloped lot is moving at all or might move at some time, the property owner—for his or her own good—should not be allowed to build a home that could suffer damage in the distant future, notwithstanding that the potential damage could be repaired.

Nor does the city argue that construction on plaintiffs' lots is likely to damage the property of others or to cause a block glide by weakening the stability of Zone 2. The CSA report concluded that "the lots can be developed without **causing** the large, regional landslide to be destabilized." Although the city council rejected that conclusion, we should credit the opinion of the experts who wrote the report, not the findings of a legislative body like the council. (See *Lucas, supra*, 505 U.S. at pp. 1025, fn. 12, 1026–1029 [112 S.Ct. at pp. 2898, fn. 12, 2899–2900] (maj. opn. of Scalia, J.); *id.* at pp. 1039–1041, 1052–1060 [112 S.Ct. at pp. 2905–2906, 2912–2917] (dis. opn. of Blackmun, J.) [criticizing majority for not giving any weight to legislative findings].) In a portion of his testimony with which the trial court did not disagree, Foster stated that 16 new homes would not undermine the stability of the area, emphasizing the minimal weight of the additional dwellings and their positive effect on diverting rain water. He also testified, "From the standpoint of the old landslide surface reactivating the mov[ement] to tear these homes apart, no, I don't see the risk there." An initial CEQA study in 1996 stated: "[F]uture development in Zone 2 would not adversely impact any unique geologic or physical features." Further, the city's own conduct—in approving additions to existing homes from 1988 to 2005—is inconsistent with its assertion that construction on plaintiffs' properties would be detrimental, especially given the approved expansion and remodeling of homes in Zone 5. "The fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common-law prohibition . . . ." (*Lucas, supra*, 505 U.S. at p. 1031 [112 S.Ct. at p. 2901].) Chang, the hydrologist, condemned the city's distinction between existing homes and undeveloped lots. And a similar view was expressed by the *Lucas* court, which questioned "the fact that the [state] statute permits owners of *existing* structures to remain (and even to rebuild if their structures are not 'destroyed beyond repair,' . . .)." (*Id.* at p. 1025, fn. 11 [112 S.Ct. at p. 2898, fn. 11], original italics.) Here, the city has approved so many exemptions and exception permits for existing homes that applying the moratorium to plaintiffs' undeveloped lots is equally questionable. For his part, Tofani said that allowing construction on *all 47 undeveloped lots* "would have a tendency to further reduce the factor of safety." But that statement, without more, is not substantial evidence as to how or when the desired construction—on *plaintiffs' 16 lots*—might affect anyone's health, safety, or property, if at all. The city does not cite any other evidence on this subject.

Fifth, while the city's building code requires a safety factor of at least 1.5 for residential construction, the code should be accorded no more weight than the statute in *Lucas*. As the court explained there, the common law, not statutory law, is determinative in a categorical takings case. (See *Lucas, supra*, 505 U.S. at pp. 1025, fn. 12, 1026–1029 [112 S.Ct. at pp. 2898, fn. 12, 2899–2900] (maj. opn. of Scalia, J.); *id.* at pp. 1039–1041, 1052–1060 [112 S.Ct. at pp. 2905–2906, 2912–2917] (dis. opn. of Blackmun, J.).) Similarly, although the record contains ample evidence about the factor of safety, in general and as applied to this case, state nuisance law focuses on the actual harm posed by plaintiffs' intended use of the property, not scientific labels that merely reflect the uncertainties of the situation. (See *People ex rel. Gallo v. Acuna, supra*, 14 Cal.4th at p. 1105; *San Diego Gas & Electric Co. v. Superior Court, supra*, 13 Cal.4th at pp. 937–938.) The risk of property damage and personal injury, as we have said, is not sufficient in any practical sense to justify applying the moratorium to plaintiffs' lots.

We do not question the use or importance of factors of safety—as recognized by geotechnical professionals—in assessing whether land is suitable for residential construction. But here, given the differing, and sometimes conflicting, views of numerous written reports and several witnesses, the trial court could not make a definitive finding on the safety factor, ultimately deciding that the stability of Zone 2 was uncertain. That finding is simply not adequate to satisfy the city's burden of proof under *Lucas* and state nuisance law.

Finally, the trial court expressed the view that the city should not have to risk bankruptcy in allowing plaintiffs to build. The city, however, has not raised this consideration. As of now, any potential suits based on a future slide are purely speculative. And speculation does not justify violating the state Constitution and depriving plaintiffs' land of all economically beneficial use.

For the foregoing reasons, we conclude that the city's resolution effected a permanent taking of plaintiffs' properties. In *Lucas*, the court applied a categorical takings rule to a government moratorium on residential construction along the beach. That moratorium was based on the theory that the presence of homes would contribute to erosion, which, in turn, would expose the homes to damage by the wind and waves. On remand, the South Carolina Supreme Court concluded that the common law did not justify the moratorium despite the property damage to beachfront homes. *Lucas* compels the conclusion we reach today.

We therefore remand the case to the trial court for the determination of an appropriate remedy. In that respect, plaintiffs express concern that the

city might impose additional or new restrictions on their attempt to build. We expect the city to proceed in good faith. "Government authorities, of course, may not burden property by imposition of repetitive or unfair land-use procedures . . . ." (*Palazzolo v. Rhode Island, supra*, 533 U.S. at p. 621 [121 S.Ct. at p. 2459].) The city may not "engage in endless stalling tactics, raising one objection after another so that the regulatory process never comes to an end." (*Mola Development Corp. v. City of Seal Beach* (1997) 57 Cal.App.4th 405, 417, fn. 6 [67 Cal.Rptr.2d 103].)

## III

## DISPOSITION

The judgment is reversed, and the case is remanded for further proceedings to determine an appropriate remedy for the permanent taking exacted by the city. Plaintiffs are entitled to their costs on appeal.

Rothschild, J., and Hastings, J.,* concurred.

A petition for a rehearing was denied October 22, 2008, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied December 17, 2008, S168175.

---

*Retired Associate Justice of the Court of Appeal, Second Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.